IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | | |
|---|---|---|
| LISA G. BEYER | ) | Civil No. 03-714-JE |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| BAKER SCHOOL DISTRICT 5J; | ) | |
| and DAVID S. GILES, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

     Tom Steenson
     Beth Creighton
     Steenson, Schumann, Tewksbury, Creighton & Rose, P.C.
     500 Yamhill Plaza Building
     815 S.W. Second Avenue
     Portland, OR 97204
        Attorneys for Plaintiff


     Peter R. Mersereau
     Mersereau & Shannon LLP
     1600 Benjamin Franklin Plaza
     One S.W. Columbia Street
     Portland, OR 97258
        Attorney for Defendant Baker School District 5J

William G. Earle
Nicole M. Rhoades
Davis, Rothwell, Mullin, Earle & Xochihua, P.C.
1300 Southwest Fifth Avenue, Suite 1900
Portland, OR 97201-5604
        Attorneys for Defendant David S. Giles

JELDERKS, Magistrate Judge:


Plaintiff Lisa Beyer brings this action for employment discrimination under Title VII, 42 U.S.C. § 1983, and state law against defendants Baker School District 5J (the District) and David S. Giles, former principal of the Baker Middle School. Plaintiff alleges that defendants subjected her to a hostile work environment and retaliated against her because she complained of sexual harassment. Plaintiff also brings claims for battery and intentional infliction of severe emotional distress.

Defendants move for summary judgment and to strike evidence submitted by plaintiff in opposition to the motions for summary judgment. I recommend granting the motions for summary judgment except as to plaintiff's claims for battery. I recommend denying defendants' motions to strike as moot.

**BACKGROUND**[1]

Plaintiff began working at the Baker Middle School (the School) in 1990 as a teacher's assistant. Starting in 1999, plaintiff worked for the School as a full-time secretary.

The District hired Giles to be principal of the School for the 1998-99 school year. As principal, Giles was plaintiff's supervisor. Giles became acquainted with plaintiff and her husband outside of the School because they attended the same church. Giles occasionally socialized with plaintiff's husband.

At some point early in his tenure, Giles and plaintiff began talking in Giles's office about their personal troubles, such as plaintiff's worries about her son and Giles's financial problems. Plaintiff sometimes cried during these conversations, and Giles expressed his sympathy. Plaintiff testified, "I think [Giles] thought he was trying to console me." Beyer Dep. at 55.

During one of these personal conversations, Giles hugged plaintiff. Although plaintiff was caught off guard, Giles's first hug "seemed okay" to her, and she did not object. Id. at 54.

_____

[1]The following background is relevant only to the pending motions.

Giles began a practice of hugging plaintiff during their private conversations. When Giles hugged plaintiff, he would say things like, "I'm worried about you," or "I'm sorry, you're a good family, you shouldn't have to go through this." Id. at 56.

During Giles's first two hugs, plaintiff left her arms at her side. Plaintiff testified that during later hugs, "when [Giles] would put his arms around me, my hand would be kind of like on his back, or maybe his shoulder, I can't remember." Id. at 63. Plaintiff never told Giles that she objected to the hugs. Plaintiff testified that she tried to indicate her disapproval by being "a little bit squirm-ish. I would kind of try to stand back. I would be in a hurry to get out of the hug." Id. at 59.

When Giles hugged plaintiff, he sometimes kissed her on the cheek. Plaintiff never told Giles that she did not want him to kiss her on the cheek, although she would "kind of" back off from Giles when he kissed her. Id. at 64.

Plaintiff was one of three secretaries at the School. In February 2001 and again in April 2002, Giles recommended in writing that plaintiff be promoted from Secretary I to Secretary II, which would bring a pay raise. Defendants submit evidence indicating that plaintiff was reclassified in

September 2002 to Secretary II, although plaintiff denies receiving higher pay.

In early 2002, the District decided to eliminate one of the three secretary positions and divide that position's duties between plaintiff and the other remaining secretary. In spring 2002, the District began the process of deciding how to allocate work assignments. By agreement, the District was required to negotiate with the Oregon School Employees Association (OSEA), plaintiff's union, to determine the division of labor between plaintiff and the other secretary.

In late April or early May 2002, Giles talked to plaintiff about taking on additional duties, including working in the guidance office. Plaintiff asked Giles "how he thought I could get all of that done in a day." Id. at 96. Giles responded that plaintiff would "figure out a way."

One of plaintiff's duties was calling the parents of students who were absent. In spring 2002, Giles met with plaintiff because she was not making some of the required calls. At her deposition, plaintiff admitted, "I didn't always get all of the calling done. I did the best I could. I for sure called ones that stood out in my mind that were probably skipping." Id. at 206-07. Giles told plaintiff that she needed to do the best she could, which plaintiff considered to be a fair response.

On May 22, 2002, Giles asked plaintiff to go into an office with him.  Plaintiff testified that after a brief conversation, "all of a sudden, out of nowhere, I didn't even see it coming, [Giles] grabbed me like he was going to hug me, and he pulled me in tighter than he ever had before."  Id. at 75.  Plaintiff put her hand on Giles's shoulder to avoid him, but Giles kissed her on the lips.  Plaintiff did not respond to the kiss, keeping her lips closed.  She testified that she "found [the kiss] very repulsive.  It was like his whole mouth was open, and like he was slobbering."  Id. at 78.  Giles then "started making thrusting motions with his pelvic area into my body."  Id.[2]

Plaintiff pushed away from Giles.  As plaintiff was leaving the room, Giles said, "people wouldn't understand our relationship, so we shouldn't tell anybody."  Id. at 79. Plaintiff did not respond to this statement, and testified that she felt threatened by it.  The entire incident lasted no more than five minutes.

Plaintiff did not tell anyone about the kiss until October 2002.  Plaintiff explained her silence:

> I just found the whole thing so disgusting and
> repulsive, and I was so overwhelmed, because I
> thought Mr. Giles was somebody I could trust, that I
> just wanted to pretend like it never even happened,

---

[2]Giles contends that the kiss was consensual and that he did not make any thrusting motions.

because I didn't want to think about it.  I just
wanted to pretend that it never happened or it would
all go away.

Id. at 81.  Afterwards, plaintiff did not tell Giles how she

felt about the kiss.  Plaintiff stated that she was scared and

did not want to talk to Giles or be alone with him.

Plaintiff knew about the District's policy against sexual

harassment.  However, plaintiff mistakenly thought that the

policy prohibited only more egregious conduct, such as

attempted rape.

In late August 2002, Giles asked plaintiff to talk to him

alone in an office.  Plaintiff closed the door at his

insistence.  At some point while they talked, Giles touched

plaintiff's knee.  After about five minutes, plaintiff left

the room to answer the telephone.  Plaintiff did not talk

about this incident until October, and she did not mention it

in her initial claim letter to the District.

Sometime in September 2002, Giles asked plaintiff about

failing to call parents of absent students.  Giles told

plaintiff that he wanted her to sign a "contract" agreeing to

make the calls.  Plaintiff responded that she was making the

"necessary" calls and was "trying" to verify which students

were absent.  Plaintiff told Giles that she would not sign a

document without a union representative's presence, and that

she might want to consult an attorney.  Giles again told

plaintiff that he did not believe that she was making all the required calls, and plaintiff began to cry. Giles told her that he would put the unsigned "contract" in her personnel file. A few hours later, Giles relented. He told plaintiff that he had ripped up the contract and thrown it away. Plaintiff thanked Giles and he left.

On October 4, 2002, plaintiff told Mary Kay Brant, a field representative for plaintiff's union, that Giles had sexually harassed her. Brant was meeting with District Superintendent Donald Ulrey on October 7, 2002, to discuss the assignment of additional duties to plaintiff and the other remaining secretary. At the meeting, Brant told Ulrey about the alleged sexual harassment reported by plaintiff.

Brant emphasized to Ulrey that the School needed to protect plaintiff from Giles while the School still employed Giles. Ulrey agreed to place plaintiff on paid administrative leave starting that day, for her protection. On October 8, 2002, Brant wrote Ulrey a letter, stating in part, "we appreciate your continued protection of [plaintiff] through administrative leave, at your discretion/as needed, when Mr. Giles is on the premises." Brant Aff., Ex. 1, at 1.

At about this time, Ulrey learned that in 1993, Giles had resigned as the principal of a Utah middle school because he had a consensual sexual relationship with a female employee.

The parties dispute the relevance and admissibility of Giles's past conduct.

Both sides submit declarations from Henry Jolley, who was the superintendent of the Wasatch County School District, Utah, from 1986 to 1996, during Giles's tenure as principal of the Wasatch Middle School. In 1993, Giles confessed to Jolley that he had been in a consensual sexual relationship with a married female subordinate at the school. Giles was also married. Because of the affair, Giles was transferred to another school. Continued controversy led Jolley to ask Giles to resign.

In a December 1993 document setting the terms of Giles's resignation, Giles and the Wasatch County School District agreed that there would be "[n]o reference verbally or in writing as to reason for resignation." Jolley Suppl. Decl., Ex. A, at 1. Giles was to receive letters of recommendation from Jolley and the president of the school board, and "be held harmless from any further actions, legal or otherwise by the Wasatch County School District." Id.

In 1997, after Giles had applied for the principal position at the School, Jolley talked by phone about Giles with a person from the District. Jolley states, "I have no recollection of disclosing to or discussing with the Baker City School District caller in or about 1997 any sexual or

other misconduct on the part of Mr. Giles that led to his resignation from the Wasatch School District in December of 1993." Jolley Suppl. Decl. at 2. Because the caller was apparently a member of an interview committee and not the District Superintendent, Jolley states that he "would have been reluctant to discuss a former employee's performance issues with an untrained individual who might not have understood the limitations on the use and dissemination of such information during the hiring process." Id. Clarifying his earlier declaration submitted by plaintiff, Jolley states in his supplemental declaration that if he ever described Giles as a "sexual predator," it would have been only after learning about Giles's alleged conduct in 2002, and not when the District asked him about Giles in 1997.

On October 10, 2002, Ulrey met with plaintiff and her husband. Ulrey told plaintiff that the Board had accepted Giles's resignation the previous day, but that Ulrey did not know whether Giles might return to the school to retrieve belongings. Ulrey decided that plaintiff should continue on paid administrative leave through the end of the week to avoid a confrontation with Giles. Ulrey was confident that both plaintiff and Brant, the union representative, agreed with this plan.

Ulrey told plaintiff not to tell others about Giles's alleged harassment because investigation was ongoing. Plaintiff now characterizes Ulrey's request as a gag order.

Plaintiff returned to work in mid-October 2002. She went on medical leave at the end of October.

By letter dated December 4, 2002, Ulrey notified plaintiff that she had been promoted to a Secretary II position, with an increase in wages.[3] Regarding plaintiff's job assignments, Ulrey stated that the secretarial duties had been "divided as equally as possible after review by two previous secretaries and the OSEA representative." Ulrey Affid., Ex. A. Ulrey wrote, "There is no reason for you to think the district would retaliate toward you for any reason. Your job is not in jeopardy." Id. Ulrey concluded, "I hope you are feeling much better and back to work real soon." Id.

In February 2003, Ulrey approved plaintiff's request for medical leave. On May 30, 2003, Ulrey wrote plaintiff to approve her request that she be paid for thirty-one hours of accumulated compensatory time. Ulrey also notified plaintiff that as of June 11, 2003, she would have exhausted her available compensatory time, contractual paid leaves, and statutory leaves, meaning that the District expected her to

_____

[3]At her deposition, plaintiff testified that she was reclassified to Secretary II in September 2002, with a pay increase. Beyer Dep. at 122.

report to work on June 11, 2003, or be placed on an unpaid
leave of absence.  Ulrey wrote,

> As has been true throughout your period of absence
> from the District, your position as of the date of
> your departure remains available and open to you.
> It is the District's hope that you are able to
> return to your duties on June 11, 2003 and to
> continue in your position thereafter.  If you are
> unable to do so, and elect to be placed on unpaid
> leave, the District will expect that you will be
> able to return to your position by the start of
> the 2003-04 school year.

Id., Ex. B, at 2.

Plaintiff has not returned to work.  She remains on
unpaid medical leave.

**STANDARDS**

The court must grant summary judgment if there are no
genuine issues of material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P.
56(c).  If the moving party shows that there are no genuine
issues of material fact, the nonmoving party must go beyond
the pleadings and designate facts showing an issue for trial.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The substantive law governing a claim or defense
determines whether a fact is material.  T.W. Elec. Serv., Inc.
v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th
Cir. 1987).  The court should resolve reasonable doubts about
the existence of an issue of material fact against the moving
party.  Id. at 631.  The court should view inferences drawn

from the facts in the light most favorable to the nonmoving
party.  Id. at 630-31.

## DISCUSSION

## I.  Sexual Harassment and Hostile Environment Claims

### A.  Standards

To establish a hostile environment claim based on sexual
harassment, a plaintiff must show: (1) that she was subjected
to verbal or physical conduct of a sexual nature; (2) that
the conduct was unwelcome; and (3) that the conduct was
sufficiently severe or pervasive to alter the conditions of
the plaintiff's employment and create an abusive work
environment.  Vasquez v. County of Los Angeles, 349 F.3d 634,
642 (9th Cir. 2004).

The work environment must be perceived as abusive both
subjectively and objectively.  Harris v. Forklift Sys., Inc.,
510 U.S. 17, 21 (1993).  In determining whether the alleged
conduct was sufficiently hostile or abusive, the court must
examine all the circumstances, including the frequency of the
alleged discriminatory conduct; its severity; whether the
conduct was physically threatening or humiliating, or mere
offensive utterances; and whether the conduct unreasonably
interfered with an employee's work performance.  Clark County
School Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)
(citations omitted).  Simple teasing, offhand comments, or
isolated incidents, unless very serious, do not show

discriminatory changes in the terms and conditions of employment.  Id. (citations omitted).

Whether the workplace is objectively hostile is determined from the perspective of a reasonable person with the same fundamental characteristics as the plaintiff.  Crowe v. Wiltel Communications Sys., 103 F.3d 897, 899 (9th Cir. 1996); see also Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991) (the "reasonable person" in sexual harassment case brought by female plaintiff is a reasonable woman).

The standards for hostile environment claims under Oregon law parallel those for Title VII claims.  Bergin v. North Clackamas School Dist., No. CV-03-1412-ST, 2005 WL 66069, at *17 (D. Or. Jan. 12, 2005).  Similarly, the requirements for a claim under § 1983 for employment discrimination parallel those for Title VII claims.  See Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1112-13 (9th Cir. 1991)  ("A plaintiff who fails to establish intentional discrimination for purposes of Title VII . . . also fails to establish intentional discrimination for purposes of § 1983.").

## B.  Discussion

### 1.  There Was No Hostile Environment

Plaintiff has failed as a matter of law to show that a reasonable jury could find that she was subjected to a sexually hostile environment at the School.  The two main

incidents cited by plaintiff, the May 2002 kiss and hug, and
the August 2002 hand on the knee, are not sufficient to
establish a hostile environment in light of all the
circumstances.  See Brooks v. City of San Mateo, 229 F.3d 917,
925-26 (9th Cir. 2000) (single fondling incident, followed by
employer's immediate corrective action, not sufficiently
severe or pervasive).  Cf. Little v. Windemere Relocation,
Inc., 301 F.3d 958, 967 (9th Cir. 2002) (single incident
sufficiently severe to establish hostile environment when the
plaintiff was allegedly raped three times and the defendant
took no remedial action when notified).  In Brooks, there was
no hostile environment even though the conduct at issue
resulted in the harasser serving 120 days in jail for sexual
assault.  229 F.3d at 922.  Plaintiff does not allege that
Giles or anyone else ever made sexually charged remarks to
her.

Here, the two incidents were preceded by ten or more
personal conversations between plaintiff and Giles,
conversations that usually included hugs and kisses on the
cheek.  Plaintiff testified that the first hug from Giles was
"OK" and that she had trusted Giles until he kissed her on the
mouth in May 2002.  Plaintiff also testified that after the
second time Giles hugged her, she would put her arms on his
back or shoulder when they hugged.

Plaintiff contends that the hugs and kisses preceding the May 2002 kiss were also incidents of sexual harassment. However, plaintiff never complained to Giles or anyone else. Plaintiff testified that she made nonverbal signs of disapproval, such as squirming, but these subtle signs were belied by her putting her arms on Giles's back or shoulder during the hugs.

I recommend granting defendants' motions for summary judgment on plaintiff's hostile environment claims.

I note that in her argument regarding her claim under 42 U.S.C. § 1983, plaintiff contends that she is entitled to lost wages because she was constructively discharged. Plaintiff has failed as a matter of law to show constructive discharge.

To establish a constructive discharge under federal law, the plaintiff must show that a reasonable person in the plaintiff's position would have felt forced to quit because of intolerable and discriminatory working conditions. <u>Montero v. AGCO Corp.</u>, 192 F.3d 856, 861 (9th Cir. 1999) (citing <u>Steiner v. Showboat Operating Co.</u>, 25 F.3d 1459, 1465 (9th Cir. 1994)). To establish a constructive discharge under state law, the plaintiff must show that the employer intentionally created or maintained working conditions that were so intolerable that a reasonable person in the plaintiff's position would have resigned; that the employer intended to cause the employee to leave because of the working conditions,

or knew that the plaintiff was substantially certain to leave because of the conditions; and that the employee in fact left because of the conditions. <u>McGanty v. Staudenraus</u>, 321 Or. 532, 557, 901 P.2d 841, 856-57 (1995).

Here, Giles resigned as soon as plaintiff complained to the District. Plaintiff has been on medical leave because of stress and other conditions. The District states that plaintiff's position remains available to her whenever her physicians approve of her return to work. Plaintiff's speculations about current conditions at the School do not show the objectively intolerable circumstances that could establish a claim of constructive discharge.

### 2. The District Is Entitled to the Affirmative Defense

The District contends that even if plaintiff had presented sufficient evidence of a hostile environment, it is entitled to summary judgment based on the affirmative defense described in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 764 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). I agree.

The District bears the burden of proof on the affirmative defense. The District first must show that plaintiff did not suffer a tangible employment action. If there was no tangible employment action, the District must then show that it exercised reasonable care to prevent and to correct harassment

promptly; and that plaintiff unreasonably failed to use the District's complaint procedure.  See Ellerth, 524 U.S. at 764.

### a.  Tangible Employment Action

The affirmative defense is not available if the "'supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'"  Montero, 192 F.3d at 861 (quoting Ellerth, 524 U.S. at 765).  Here, I agree with the District that plaintiff did not suffer a tangible employment action because of the alleged harassment by Giles.  To the extent that plaintiff received additional duties, that was because in early 2002 the District decided to eliminate one of the three secretarial positions.  Giles recommended that plaintiff be promoted to Secretary II, which did occur.  Plaintiff never lost her job and could have her job back if she is medically able to return.

### b.  The District Exercised Reasonable Care

The first part of the affirmative defense requires the defendant employer to show that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior."  Ellerth, 524 U.S. at 765.  Here, the District has shown that it exercised reasonable care to prevent sexual harassment by having a policy against sexual harassment, making that policy known to its employees, and acting promptly when plaintiff finally reported the alleged harassment.  The

District briefly placed plaintiff on paid administrative leave with the agreement of a union representative, to ensure that she did not encounter Giles.

### c.  Plaintiff Unreasonably Failed to Use the District's Procedures

The second part of the affirmative defense requires that the defendant employer show that the plaintiff employee "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765.

Here, plaintiff admits that she was aware of the District's policy against sexual harassment, but incorrectly assumed that it covered only more serious conduct.  I agree with the District that plaintiff's misunderstanding of the policy is not relevant, so long as the District had a reasonably effective policy and made that policy known to its employees.

Plaintiff alleges that she felt that Giles had threatened her to keep her from complaining.  Plaintiff alleges that immediately after the May 2002 kiss, Giles told her that they should keep quiet about the incident because others would not understand.  However, a generalized fear of retaliation cannot justify a failure to report sexual harassment. See, e.g., Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir. 2001).  At her deposition, plaintiff testified that she failed to report the incident to anyone because she was

disgusted by it and wished to put it behind her, not because she feared retaliation.  (Plaintiff did testify that she was afraid to be alone with Giles after the kiss.)

## II.  Retaliation Claims

Plaintiff brings retaliation claims under Title VII, 42 U.S.C. § 1983, and Or. Rev. Stat. § 659A.030.

### A.  Title VII Retaliation Claim

#### 1.  Legal Standards

Title VII prohibits employers from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  To establish her Title VII retaliation claim, plaintiff must show: (1) that she acted to protect her Title VII rights; (2) that an adverse employment action was thereafter taken against her; and (3) that a causal link exists between these two events.  Little v. Windermere Relocation, Inc., 301 F.3d 958, 969 (9th Cir. 2002).

A causal link may be inferred from circumstantial evidence, such as the employer's knowledge of the earlier protected activity and the proximity in time between the protected activity and the adverse employment action.  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987).

An "adverse employment action," for purposes of a retaliation claim, is "'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the

charging party or others from engaging in a protected activity.'" Little, 301 F.3d at 970 (quoting Ray v. Henderson, 217 F.3d 1234, 1244 (9th Cir. 2000)).

If the plaintiff establishes the elements of a prima facie retaliation claim, the burden of production shifts to the employer to articulate legitimate, non-discriminatory reasons for its actions. Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994). If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the proffered reasons are pretextual. Id. To avoid summary judgment, the plaintiff must offer "specific and significantly probative" evidence that the employer's explanation for its action is a pretext for discrimination. Schuler v. Chronicle Broadcasting Co., 793 F.2d 1010, 1011 (9th Cir. 1986).

## 2. Discussion

I conclude that plaintiff has failed as a matter of law to show that she suffered any adverse employment action in retaliation for engaging in protected activity.

Plaintiff contends that she has pointed to several alleged adverse employment actions. Plaintiff cites Giles's attempt in fall 2002 to have her sign a document promising to call all the parents of absent children. However, Giles relented and threw away the document without placing it in plaintiff's personnel file, so it is doubtful whether this

could be an adverse employment action.  Even assuming a retaliatory motive, defendants have shown that Giles had legitimate reasons for requiring that plaintiff properly perform this duty.  Plaintiff has admitted that in spring 2002, she was failing to make all the required calls.

Plaintiff contends that Ulrey's decision to place her on paid administrative leave for a week was an adverse employment action.  However, the District placed plaintiff on leave to protect plaintiff from an encounter with Giles.  Brant, plaintiff's union representative, endorsed the use of administrative leave.  Placement on administrative leave under these circumstances was not an adverse employment action.

Plaintiff complains that she was retaliated against in the District's assignment of duties to her after the elimination of the third secretarial position.  However, the division of duties between plaintiff and the remaining other secretary required negotiation between the District and plaintiff's union, a process that began well before plaintiff complained of sexual harassment.  Plaintiff contends that while she was on medical leave, the District placed a known sexual harasser in an office near where plaintiff would work if she returned from medical leave.  Regardless of the accuracy of plaintiff's description of the employee in question, this is too tenuous to be an adverse employment action.

Plaintiff complains that in response to her complaint with the Oregon Bureau of Labor and Industries, the District solicited statements from other employees about plaintiff's job performance. The District was entitled to defend itself, so its conduct in response to plaintiff's complaint cannot be considered an adverse employment action.

Plaintiff cites Ulrey's letters to her while she was on medical leave as examples of adverse employment actions. However, encouraging an employee on medical leave to return to work as soon as the employee is able does not constitute an adverse employment action.

I conclude that plaintiff has failed as a matter of law to show that she suffered any adverse employment action in retaliation for her complaint of sexual harassment. Her Title VII retaliation claim therefore fails.

**B. § 1983 and State Law Retaliation Claims**

Plaintiff brings retaliation claims under 42 U.S.C. § 1983 and Or. Rev. Stat. § 659A.030. I recommend granting summary judgment for defendants as to these claims for the same reasons that summary judgment should be granted on plaintiff's Title VII retaliation claim.

**III. Violation of Free Speech Rights**

Plaintiff brings a claim under 42 U.S.C. § 1983, alleging that the District interfered with her free speech rights under the First Amendment by allegedly retaliating against her for

complaining of sexual harassment and telling plaintiff that
she could not disclose the alleged sexual harassment.  I agree
with defendants that plaintiff's free speech claims lack
merit.

To make a prima facie case on this claim, plaintiff must
show that "(1) she engaged in protected speech; (2) the
defendants took an 'adverse employment action' against her;
and (3) her speech was a 'substantial or motivating' factor
for the adverse employment action."  Thomas v. City of
Beaverton, 379 F.3d 802, 808 (9th Cir. 2004) (citation
omitted).  Plaintiff's speech "is protected only if she spoke
'as a citizen upon matters of public concern' rather than 'as
an employee upon matters only of personal interest.'"  Id.
(quoting Roe v. City of San Diego, 356 F.3d 1108, 1112 (9th
Cir.), rev'd, 125 S. Ct. 521 (2004)).

Here, the speech in question is plaintiff's complaint of
sexual harassment against Giles.  Plaintiff did not speak out
about the District's sexual harassment policy or about other
matters of possible public concern.  I agree with the District
that plaintiff's grievances here were purely personal to her.
See Doherty v. Portland Community College, 2000 WL 1738862, at
*17-18 (D. Or. Nov. 21, 2000) (First Amendment does not
protect every complaint of discrimination by an employee about
the workplace of a public employer).

Plaintiff argues that the District's request that she not discuss her complaint within the District while Ulrey was investigating the complaint was a form of prohibited prior restraint of free speech. I agree with the District that plaintiff has not shown that she has a First Amendment right to publicly discuss a complaint of discrimination while an investigation is ongoing.

## IV. Intentional Tort Claims

### A. Battery

"To constitute liability for a battery, the conduct which brings about the harm must be an act of volition on the actor's part, and the actor must have intended to bring about a harmful or offensive contact or put the other party in apprehension thereof." Bakker v. Baza'r, Inc., 275 Or. 245, 249, 551 P.2d 1269, 1271 (1976) (citation omitted). "It is not necessary that the contact do actual physical harm--it is sufficient if the contact is offensive or insulting." Id.

#### 1. Giles

Material issues of fact preclude summary judgment as to plaintiff's battery claim against Giles. Viewing the facts in the light most favorable to plaintiff, as is required on summary judgment, a jury could conclude that Giles committed battery.

Giles argues that because plaintiff alleges that he was acting in the scope and course of his employment when he

committed the alleged battery, only the District can be liable.  See Or. Rev. Stat. § 30.265(1) (Oregon Tort Claims Act).  However, plaintiff is permitted to plead her battery claim in the alternative.  As discussed below, material issues of fact exist regarding whether Giles was acting in the course and scope of his employment when the alleged battery occurred.  If the jury finds that Giles committed battery, and that he was not acting in the course and scope of his employment when the battery occurred, then Giles would be personally liable, and the District would not be liable.

### 2.  The District

Under Oregon law, an employer may be vicariously liable for an employee's tortious conduct

> when the employee acts within the course and scope
> of employment.  To establish that the employee acted
> "within the course and scope" of employment requires
> proof of three things:  (1) the tortious act must
> have "occurred substantially within the time and
> space limits authorized by the employment"; (2)
> the employee must have been "motivated, at least
> partially, by a purpose to serve the employer";
> and (3) the employee's act "is of a kind which the
> employee was hired to perform."

Vinsonhaler v. Quantum Residential Corp., 189 Or. App. 1, 5, 73 P.3d 930, 932-33 (2003) (quoting Chesterman v. Barmon, 305 Or. 439, 442, 753 P.2d 404, 406 (1988)).

In Vinsonhaler, as here, the plaintiffs alleged that they were sexually harassed by their supervisor "during the time and space limits authorized by the employment."  Id.  There,

the Court of Appeals concluded that the employer was entitled to summary judgment, stating:

> The focus of the inquiry is not necessarily whether an employee's tortious conduct itself was intended to serve the employer but, rather, whether the employee engaged in conduct that was intended to serve the employer and that conduct results in the acts that injured the plaintiff.

189 Or. App. at 6, 73 P.3d at 933.  In affirming the grant of summary judgment for the employer, the Vinsonhaler court noted that "there is no evidence that Ramey [the alleged tortfeasor] cultivated a relationship of trust that facilitated his commission of tortious acts.  There is no evidence that Ramey engaged in conduct of any sort that was intended to serve defendant and that that conduct resulted in sexual harassment."  Id.

Although this is a close issue, I conclude that a jury could determine that Giles "cultivated a relationship of trust" with plaintiff "that facilitated his commission of tortious acts."  I recommend denying summary judgment as to plaintiff's battery claims against the District.

### 3.  Supplemental Jurisdiction

In light of my recommendations that defendants' motions for summary judgment be granted as to all of plaintiff's federal claims, I recommend that this court decline to take supplemental jurisdiction over plaintiff's battery claims. The court has discretionary authority under 28 U.S.C.

§ 1367(c) to decline jurisdiction under these circumstances.
"[I]n the usual case in which all federal-law claims are
eliminated before trial, the balance of the factors to be
considered under the pendent jurisdiction doctrine--judicial
economy, convenience, fairness, and comity--will point toward
declining to exercise jurisdiction over the remaining
state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S.
343, 350 n.7 (1988).

### B. Intentional Infliction of Severe Emotional Distress

Plaintiff brings a claim for intentional infliction of
severe emotional distress. I recommend granting defendants'
motions for summary judgment as to this claim.

To establish a claim for intentional infliction of severe
emotional distress, a plaintiff must show that (1) the
defendant intended to inflict severe emotional distress on the
plaintiff; (2) the defendant's acts were the cause of the
plaintiff's severe emotional distress; and (3) the defendant's
acts were an extraordinary transgression of the bounds of
socially tolerable conduct. McGanty v. Staudenraus, 321 Or.
532, 543, 901 P.2d 841, 849 (1995). "While IIED claims are
common in the context of employment disputes, Oregon appellate
courts have been very hesitant to impose liability for IIED
claims in employment settings, even in the face of serious
employer misconduct." Robinson v. U.S. Bancorp, No.
CV-99-1723-ST, 2000 WL 435468, at *8, Findings and

Recommendation (D. Or. Mar. 17, 2000), adopted April 20, 2000.

Here, taking the evidence in the light most favorable to plaintiff, plaintiff has failed to show that a reasonable jury could find for her on the intentional infliction claim. In light of the history of hugs and kisses on the cheek, Giles's unwelcome kiss and embrace, and his touching of plaintiff's knee, are not extraordinary transgressions of the bounds of socially tolerable conduct as those terms are used in Oregon law. Nor does the District's conduct toward plaintiff meet the standards required by the Oregon courts to survive summary judgment. I recommend granting summary judgment for defendants on plaintiff's claim for intentional infliction of severe emotional distress.

## CONCLUSION

Defendants' motions for summary judgment (#53, #58) should be granted except as to plaintiff's battery claims. The court should decline supplemental jurisdiction over the battery claims. Defendants' motions to strike (#75, #78) should be denied as moot.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due March 2, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections within 10 days after service of a copy of the objection. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or the latest date for filing a response.

DATED this 14th day of February, 2005.


/s/  John Jelderks
John Jelderks
U.S. Magistrate Judge